## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 07 2015, 9:42 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Victoria Christ
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Shepell Orr,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

October 7, 2015

Court of Appeals Case No.
45A04-1503-PC-87

Appeal from the Lake Superior Court

The Honorable Salvador Vasquez, Judge

The Honorable Kathleen A. Sullivan, Magistrate

Trial Court Cause No.
45G01-1302-PC-1

**Najam, Judge.**

# Statement of the Case

[1] Shepell Orr appeals the post-conviction court's denial of his amended petition for post-conviction relief. Orr presents two issues for our review, namely, whether he was denied the effective assistance of trial and appellate counsel. We affirm.

# Facts and Procedural History

[2] At approximately 12:00 a.m. on December 31, 2009, Orr entered an apartment building located at 3513 Guthrie in East Chicago to visit a friend, and he walked past four people visiting in a hallway. Approximately forty-five minutes later, Orr left his friend's apartment and walked past the same four people, Steven Williams, Joshua Haywood, LaTonya Burnett, and Tyree Tolbert. As he passed by the group, Orr asked Williams, "What's that smart remark you said?" Tr. at 223. Williams responded, "I don't know you to even be saying anything about you." *Id.* Orr then left the building, met Billy Galloway, who was sitting in Galloway's truck parked across the street, and got a firearm from Galloway.

[3] A few minutes later, Orr came back inside the apartment building and said to the group, "Folks, let me holler at you." *Id.* at 225. In response, Tolbert walked outside with Orr. Orr then asked Tolbert "what [Williams and Haywood were] on." *Id.* at 226. Tolbert interpreted that question to mean "like what [are] they about[?]" *Id.* Tolbert responded, "They ain't on nothing. They just moved out here with they [sic] wife and kids." *Id.* Orr then said to

Tolbert, "Don't worry about it. I'm finna[1] kill everybody in this building." *Id.* at 227. Orr then pulled out a gun and entered the apartment building. After Orr entered the building, Burnett ran outside, and she and Tolbert ran to a friend's apartment inside a nearby building. As soon as they were inside, Tolbert heard multiple gunshots from the building where he had left Orr and the others.

[4] A neighbor called 9-1-1, and officers arrived at the scene approximately ten minutes after the shootings to find Williams' and Haywood's dead bodies lying in pools of blood inside the apartment building. Williams had been shot seven times, and Haywood had been shot four times. There were no eyewitnesses to the shootings, but, after an investigation implicated Orr, police arrested him.

[5] The State charged Orr with two counts of murder. A jury found Orr guilty as charged and the trial court entered a judgment of conviction accordingly. The trial court sentenced Orr to two consecutive terms of fifty-five years, for an aggregate sentence of 110 years. On direct appeal, Orr raised a single issue, namely, whether the trial court committed reversible error in allowing the State to attempt to impeach a witness with extrinsic evidence of a prior inconsistent statement. We affirmed Orr's convictions. *Orr v. State*, 968 N.E.2d 858, 865 (Ind. Ct. App. 2012).

---

[1] "Finna" is an abbreviation of the phrase "fixing to" and means "going to." *See* Urban Dictionary, http://www.urbandictionary.com/define.php?term=finna (last viewed September 15, 2015).

On February 7, 2013, Orr filed a pro se petition for post-conviction relief. And on August 9, 2013, Orr, by counsel, filed an amended petition for post-conviction relief alleging that he was denied the effective assistance of trial and appellate counsel. Following a hearing, the post-conviction court denied Orr's amended petition. This appeal ensued.

## Discussion and Decision

Orr appeals the post-conviction court's denial of his final amended petition for post-conviction relief. Our standard of review is clear:

> [The petitioner] bore the burden of establishing the grounds for post-conviction relief by a preponderance of the evidence. See Ind. Post-Conviction Rule 1(5); *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001). Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. *Timberlake*, 753 N.E.2d at 597. Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. *Id.* If an issue was known and available, but not raised on direct appeal, it is waived. *Id.* If it was raised on appeal, but decided adversely, it is res judicata. *Id.*

> In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting the post-conviction court's judgment. *Hall v. State*, 849 N.E.2d 466, 468 (Ind. 2006). The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. *Id.* at 468-69. Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues [the petitioner] must convince this court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *See Timberlake*, 753 N.E.2d at 597. We will disturb the decision only if the evidence is

without conflict and leads only to a conclusion contrary to the result of the post-conviction court. *Id.*

*Lindsey v. State*, 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), *trans. denied*.

[8] Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). "Although we do not defer to the post-conviction court's legal conclusions, '[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made.'" *Overstreet v. State*, 877 N.E.2d 144, 151 (Ind. 2007) (citation omitted).

[9] Orr contends that he was denied the effective assistance of trial and appellate counsel in violation of the Sixth Amendment to the United States Constitution. A claim of ineffective assistance of counsel must satisfy two components. *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

## Issue One: Effective Assistance of Trial Counsel

Orr first contends that he was denied the effective assistance of trial counsel. Specifically, Orr argues that his trial counsel failed to: (1) object to the erroneous jury instructions on murder and voluntary manslaughter and tender proper instructions; and (2) adequately impeach State's witness Antonio Foster. We consider each contention in turn.

### Jury Instructions

The trial court instructed the jury in relevant part as follows:

> Instruction No. 3[2]
>
> COUNT I
>
> The crime of Murder is defined by statute as follows:
>
> A person who knowingly or intentionally kills another human being commits Murder, a felony.
>
> Before you may convict the defendant of Murder, the State must have proven each of the following elements:
>
> 1) The defendant
>
> 2) knowingly or intentionally
> 3) killed
>
> 4) Steven Williams.

---

[2] Instruction No. 4 is identical to Instruction No. 3, but it names the victim as Joshua Haywood.

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the defendant not guilty.

\* \* \*

Instruction No. 5

COUNTS I AND II

The Defendant is charged with Murder. Voluntary Manslaughter, Class A felony, is included in Murder. If the State proves the Defendant guilty of Murder, you need not consider the included crime(s). However, if the State fails to prove the Defendant committed Murder, you may consider whether the Defendant committed Voluntary Manslaughter, Class A felony, which the Court will define for you.

You must not find the Defendant guilty of more than one crime for each count.

Instruction No. 6

COUNT I

The crime of Voluntary Manslaughter is defined by statute as follows:

(a) "A person who knowingly or intentionally kills another human being while acting under sudden heat commits Voluntary Manslaughter. The offense is a Class A felony if it is committed by means of a deadly weapon."

(b) "The existence of sudden heat is a mitigating factor that reduces what otherwise would be Murder to Voluntary Manslaughter."

Before you may convict the defendant, as charged, the State must have proved each of the following elements:

1. The defendant

2. knowingly or intentionally

3. killed

4. Steven Williams

5. by means of a deadly weapon, and;

6. that the defendant did the killing while acting under sudden heat.

If the state failed to prove each of these elements beyond a reasonable doubt, you must find the defendant not guilty of Voluntary Manslaughter, a Class A felony.

Appellant's App. at 442-45.[3]

[12] Orr contends that the "instructions were erroneous" because they did not instruct the jury that "the State had to disprove sudden heat beyond a reasonable doubt before they could convict him of murder." Appellant's Br. at 16. Accordingly, Orr maintains that his trial counsel was ineffective when she did not object to the instructions and did not tender correct instructions.

---

[3] Instruction No. 7 is identical to Instruction No. 6, but it names the victim as Joshua Haywood.

The State agrees that the instructions are improper for the reasons cited by Orr. In particular, in *Eichelberger v. State*, 852 N.E.2d 631, 636 (Ind. Ct. App. 2006), *trans. denied*, we held in relevant part as follows:

> "[i]t is well settled in Indiana that sudden heat is not an element of voluntary manslaughter." *Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002) (citing *Isom v. State*, 651 N.E.2d 1151, 1152 (Ind. 1995), *reh'g denied*; *Bane v. State*, 587 N.E.2d 97, 100 (Ind. 1992), *reh'g denied*; *Palmer v. State*, 573 N.E.2d 880 (Ind. 1991); *Wilcoxen v. State*, 705 N.E.2d 198, 203 (Ind. Ct. App. 1999), *trans. denied*), *reh'g denied*. Rather, once a defendant presents evidence of sudden heat, the State bears the burden of disproving its existence beyond a reasonable doubt. *Id.* (citing Ind. Code § 35-42-1-3(b) ("The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) of this chapter to voluntary manslaughter."); *Bane*, 587 N.E.2d at 100). An instruction assigning the burden of affirmatively proving sudden heat to the State is erroneous as a matter of law. *Id.* When properly objected to at trial, it may require a new trial on the murder charge. *Id.* In addition, a trial court's failure to give a jury instruction explaining that the State must negate the presence of sudden heat beyond a reasonable doubt, when requested, necessitates the granting of a new trial. *See Harrington v. State*, 516 N.E.2d 65, 66 (Ind. 1987), *reh'g denied*.

But the State contends that Orr was not entitled to a voluntary manslaughter instruction and was not, therefore, prejudiced by the erroneous jury instructions. In support of that contention, the State correctly points out that there was no serious evidentiary dispute about the existence of sudden heat. It is well settled that an instruction on voluntary manslaughter is warranted "if the evidence demonstrates a serious evidentiary dispute regarding the mitigating

factor of sudden heat; that is, there must be evidence showing sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection." *Massey v. State*, 955 N.E.2d 247, 256 (Ind. Ct. App. 2011). As we explained in *Massey*,

> "Sudden heat is characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. *Anger alone is not sufficient to support an instruction on sudden heat. Nor will words alone constitute sufficient provocation to warrant a jury instruction on voluntary manslaughter, and this is especially true when the words at issue are not intentionally designed to provoke the defendant, such as fighting words.*
>
> In addition to the requirement of something more than mere words, the provocation must be sufficient to obscure the reason of an ordinary man, an objective as opposed to subjective standard. Finally, Voluntary Manslaughter involves an impetus to kill which arises suddenly."

955 N.E.2d at 256-57 (quoting *Suprenant v. State*, 925 N.E.2d 1280, 1282-83 (Ind. Ct. App. 2010) (citations and quotation marks omitted), *trans. denied*.) (emphasis added).

[15] Here, Orr contends that the following evidence shows that he acted in sudden heat: his "actions were prompted by an argument with the two victims," and he had little time for cool reflection between the argument and the shootings. Appellant's Br. at 24. Orr also suggests that, because no one witnessed "the last moments between Orr and the victims," there is a serious evidentiary dispute

whether he acted in sudden heat. *Id.* Orr maintains that the evidence is sufficient to support a voluntary manslaughter instruction because, "[b]ased on this evidence, the [trial court] agreed to give the voluntary manslaughter instructions." *Id.*

[16] We agree with the State that there was no serious evidentiary dispute on the issue of sudden heat. Again, words alone do not constitute sufficient provocation, especially words that are not intentionally designed to provoke. *Massey*, 955 N.E.2d at 257. Here, the only evidence of an argument between Orr and the victims is the testimony that Orr said to Williams, "What's that smart remark you said?" Tr. at 223. And Williams responded, "I don't know you to even be saying anything about you." *Id.* There is no evidence of anything more than an exchange of words, and Williams' statement was not provocative, but appears to have been intended to avoid a confrontation with Orr. And, as Orr points out, no witnesses saw or heard Orr or the victims in the moments leading up to the shootings. There is simply no evidence, let alone a serious evidentiary dispute, to show that sudden heat was a factor in the shootings. Orr was not entitled to a voluntary manslaughter instruction, and he cannot show that he was prejudiced by his trial counsel's failure to object to the trial court's erroneous instructions and to tender a proper instruction. *Massey*,

955 N.E.2d at 257.  Accordingly, Orr has not demonstrated that he was denied the effective assistance of trial counsel on this issue.[4]  *Id.*

*Witness Impeachment*

[17]   Orr next contends that his trial counsel was ineffective when she did not adequately impeach Foster, who had agreed to testify against Orr in exchange for a plea deal.  Foster had met Orr while they were both incarcerated, and Orr told Foster about the murders of Haywood and Williams.  At the time, Foster was facing "numerous charges pertaining to distributing cocaine," including dealing in cocaine, as a Class A felony.  Appellant's App. at 344.  Foster was negotiating a plea agreement with the State and offered to testify against Orr at Orr's trial in exchange for a better plea agreement.  The State agreed, and, whereas Foster was initially going to enter into an open plea on a Class B felony, he entered into an open plea on a Class C felony, and the State dismissed his remaining charges in exchange for his testimony against Orr.

[18]   Orr's argument on this issue is without merit.  When Foster testified at Orr's trial, Orr's defense counsel conducted a thorough cross-examination and focused on the benefit Foster was receiving for his testimony.  That cross-examination included the following exchange:

---

[4]  To the extent Orr asserts that, because the trial court instructed the jury on voluntary manslaughter it cannot now, on his petition for post-conviction relief, "reverse field," we cannot agree.  Appellant's Br. at 27.  Orr must show prejudice as a result of any alleged ineffective assistance of counsel.  Because Orr cannot show that he was entitled to an instruction on voluntary manslaughter, he cannot show prejudice as a result of the improper instructions, and his ineffective assistance claim fails.  *See Massey*, 955 N.E.2d at 257.

Q: This letter is what you sent to [your defense counsel] asking . . . him to get you a better plea, correct?

A: Yes.

Q: In fact, this letter says you will do anything to get a better plea, correct?

A: Yes.

Q: Okay. In fact, exact language says that I got all that written down for a good plea; probation, therapeutic [sic], community [sic], house arrest, a good plea, you think it's a good move, can you make it work? It's worth a try, isn't it? That's what you wrote your attorney, didn't you?

A: Yeah. Yes.

Q: Okay. Now, earlier . . . you said on direct examination that you have a Class A felony and multiple B felonies and a D felony over your head right now, correct?

A: Yes.

* * *

Q: Sir, according to this proffer letter that you signed . . . , you are currently charged with a Class A felony carrying a minimum penalty range of 30 years and a maximum penalty range of 50 years, correct?

A: Yes.

Q: You are also looking at five separate Class B felonies, each of them carrying a minimum sentence of six years, a presumptive sentence of 10 years and a maximum sentence of 20 years,

correct?

A: Yes.

Q: You're also looking at a Class D felony that carries a penalty of six months minimum, 18 months or a year and a half presumptive or three years as a maximum, correct?

A: Yes.

Q: Plus you are looking at the habitual offender enhancement on each of those counts, correct?

A: Yes.

* * *

Q: . . . In terms of your penalty range, if you testify according to this proffer, you are now going to be looking at a maximum of eight years, because a Class C felony has a range of two years to four years to eight years, correct?

A: Yes.

Appellant's App. at 359-67. After that cross-examination, the State requested that the trial court take judicial notice of the maximum sentence Foster faced had he not pleaded guilty. The trial court agreed and advised the jury as follows:

[T]he state has asked me to take what's called judicial notice of a particular fact that is not in question or is very clear under the laws of this state. And that is in a situation where you have one defendant who is charged with a series of dealing in a controlled substance or dealing in cocaine charges, it's dealing cases, such

as what we have here where [Foster] is charged with one Class A felony and five Class B felonies, under the same cause, such as what we have here, all six sentences would have to be served, they must be served concurrently, which means at the same time. So, therefore, if there's a conviction on all six dealing cases, dealing charges, they would all run together at the same time. They overlap. That is the state of the law and that is Indiana law. . . .

*Id.* at 387.

Orr maintains that, in fact, Indiana law does *not* require that Foster would have faced only concurrent, not consecutive sentences had he been convicted as charged. In support of that contention, Orr cites to our supreme court's opinion in *Beno v. State*, 581 N.E.2d 922, 924 (Ind. 1991), where the court held as follows:

> Beno was convicted of committing virtually identical crimes separated by only four days. Most importantly, the crimes were committed as a result of a police sting operation. As a result of this operation, Beno was hooked once. The State then chose to let out a little more line and hook Beno for a second offense. There is nothing that would have prevented the State from conducting any number of additional buys and thereby hook Beno for additional crimes with each subsequent sale. We understand the rationale behind conducting more than one buy during a sting operation, however, we do not consider it appropriate to then impose maximum and consecutive sentences for each additional violation. If Beno, for instance, had sold drugs to different persons, or if he had provided a different type of drug during each buy, the consecutive sentences imposed might seem more appropriate. Here, however, because the crimes committed were nearly identical State-sponsored buys, consecutive sentences were inappropriate.

[20] Orr maintains that, unlike the controlled buys in *Beno*, the controlled buys in Foster's case occurred weeks and months apart (January 24, February 13, June 15, and June 23) and at two different locations. Indeed, our courts have distinguished *Beno* where the facts of multiple controlled buys were "not virtually identical." *See, e.g.*, *Mendoza v. State*, 737 N.E.2d 784, 789 (Ind. Ct. App. 2000). Thus, Orr is correct that, had Foster been convicted as charged, he would not necessarily have been sentenced to concurrent terms on the dealing charges.

[21] That being said, the crux of Orr's contention on appeal is that, had his defense counsel advised the jury that Foster faced a sentence "of over one hundred (100) years [without his plea agreement, the jury] would not have found his testimony credible and would not have convicted Orr." Appellant's Br. at 36. But, again, defense counsel cross-examined Foster and established that, without his plea agreement, he faced a possible fifty-year sentence for a Class A felony conviction and an enhancement for being a habitual offender. While Orr's defense counsel did not specify that that enhancement could mean an additional thirty years, *see former* Ind. Code § 35-50-2-8, it was clear that something more than fifty years could have been imposed. And, while the trial court advised the jury that the dealing in cocaine convictions would have required concurrent sentences, the judicial notice did not address either Foster's C felony possession of cocaine charge or D felony maintaining a common nuisance charge. Thus, as far as the jury was concerned, the sentences on those counts could have run consecutive to the dealing sentences.

[22] Regardless, defense counsel clarified that, in exchange for his testimony against Orr, Foster faced a sentencing range of only two to eight years. Thus, defense counsel established that Foster's benefit for his testimony was substantial, and we cannot say that the jury would have been less likely to believe Foster if Orr's defense counsel had gone into more detail regarding the possible sentences Foster had faced. Moreover, Orr exaggerates the impact of Foster's testimony on the jury's verdict. There was ample evidence of Orr's guilt without Foster's testimony. Again, Tolbert testified that, immediately before the shootings, he saw Orr get a firearm and heard him threaten to kill "everybody in this building." Tr. at 227. And other witnesses corroborated that series of events. We cannot say that, had the jury discredited Foster's testimony, it likely would have acquitted Orr of the murders. Orr cannot show that he was prejudiced by defense counsel's impeachment of Foster, and he was not denied the effective assistance of trial counsel on that basis.

### Issue Two: Effective Assistance of Appellate Counsel

[23] Orr next contends that he was denied the effective assistance of appellate counsel. In particular, he contends that his counsel on direct appeal was ineffective when he omitted from his brief on appeal a challenge to the erroneous voluntary manslaughter instructions. Again, Orr must show that his appellate counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for the deficient performance of counsel, the result of the proceeding would have been

different. *Manzano v. State*, 12 N.E.3d 321, 329 (Ind. Ct. App. 2014) (citing *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007)), *trans. denied*.

[24] Orr's contention on this issue is derivative of his claim of ineffective assistance of trial counsel on the erroneous voluntary manslaughter instructions. Again, Orr was not entitled to a voluntary manslaughter instruction, and he cannot show that he was prejudiced by his appellate counsel's failure to raise the issue of the trial court's erroneous instructions on appeal. *Massey*, 955 N.E.2d at 257. Accordingly, Orr has not demonstrated that he was denied the effective assistance of appellate counsel. *Id.*

[25] Affirmed.

Kirsch, J., and Barnes, J., concur.